## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

EARL TYSON *et al.*,

        Plaintiffs,

        v.

TOWN OF HOMER *et al.*,

        Defendants.

Civil Action No.

2:21-CV-00077-RWS

## <u>ORDER</u>

This case comes before the Court on Defendants Town of Homer, Georgia et al.'s (the "Homer Defendants") Motion to Dismiss [22], Defendants Banks County Board of Elections et al.'s (the "Banks County Defendants") Motion to Dismiss [25], and Plaintiffs Earl Tyson et al.'s Motion for Oral Argument on Defendants' Motions to Dismiss [32]. As a preliminary matter and because of the expedited resolution that this case requires, the Court finds the briefing sufficient and does not believe oral argument is necessary. Accordingly, Plaintiffs' Motion for Oral Argument [32] is **DENIED**. After reviewing the record, the Court enters the following Order.

## Background

### I.    Factual Background

This case arises from the passage of 2020 Ga. Laws 3939 (the "Act"), through which the State of Georgia amended the Town of Homer's Charter. The individual Plaintiffs—Earl Tyson, Annette Tyson, Linda Guabelly, Amanda Acton, and Emily Acton—are residents and voters living in Homer. The business Plaintiffs—Banks County Golf, LLC and Green Ridge Builders of Georgia, LLC—are limited liability companies that own land and operate businesses in Homer. Defendants include Homer itself, officials representing Homer (including the mayor and current council members), the Banks County Board of Elections, and officials representing the Board of Elections.

Prior to the Act's passage last year, Homer's town council consisted of five council members and Homer's mayor. Each of these individuals was elected at large, and they were not subject to residency restrictions within Homer, meaning they could run for office so long as they lived anywhere in Homer. The council represents approximately 1,200 residents and 800 voters.[1]

---

[1] These numbers are based on 2010 census data, which is all that is officially available because data from the 2020 census has not yet been formally released.

Last year, Homer officials successfully petitioned Georgia's General Assembly to pass the Act. The Act made changes to Homer's election processes, which are set to be applied in the upcoming November 2021 municipal elections. First, using population data from the 2010 census, the Act divides Homer into three distinct districts (called Districts 1, 2, and 3). Then, it allocates two council positions each to Districts 1 and 2 and one council position to District 3. Although the council members are still elected by all voters of Homer in an at-large election, the Act now imposes a residency requirement. This requirement means that the council member elected to each position must reside in the district that he or she is elected to represent. Accordingly, two council members must reside in each of Districts 1 and 2, while one council member must live in District 3.

In March 2021, after the Act was passed, the Homer Town Council held a meeting that Homer residents attended. At the meeting, some residents questioned why District 3 only had one council position, while the other districts had two. According to Plaintiffs, Homer's Mayor responded that the purpose of the changes was to keep District 3 from taking over the town.

Plaintiffs reside in District 3 and raise several issues with the Act. They argue that the population data used by Defendants and the Georgia General Assembly to craft and divide the new residency districts is outdated, since the area

3

now encompassed by District 3 is a new residential subdivision near a golf course that has grown rapidly since the 2010 census. In addition, Plaintiffs contend that District 3 is more racially diverse than Districts 1 and 2. Finally, Plaintiffs allege that the Act's residency districts dilute their voting strength since only one of five council members will reside in their district, while Districts 1 and 2 will each have two council member residents.

## II.    Procedural History

On April 8, 2021, Plaintiffs filed this complaint against Defendants [1], asserting claims for declaratory judgment (Count I), injunctive relief (Count II), violations of Section 1983 (Count III), violations of the Equal Protection Clause of the Fourteenth Amendment (Count IV), violations of the Voting Rights Act (Count V), and attorney's fees and litigation expenses (Count VI).

The Homer Defendants moved to dismiss [22] Plaintiffs' complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), arguing that the Act does not violate the one-person, one-vote rule, Plaintiffs fail to allege that the Act has any racially discriminatory effect and therefore cannot assert a claim for racial vote dilution, and Plaintiffs do not have standing to bring these claims against them. Similarly, the Banks County Defendants moved to dismiss [25] Plaintiffs' complaint under Federal Rule 12(b)(6), arguing that the complaint fails to state a

vote dilution claim under either Section 2 of the Voting Rights Act or the Equal
Protection Clause of the Fourteenth Amendment. Plaintiffs oppose both motions to
dismiss [28, 29], and both sets of Defendants filed a reply in support of their
respective motions [38, 40].

## Discussion

## I.    Legal Standard

### A.    Motion to Dismiss Under Federal Rule 12(b)(1)

Federal Rule 12(b)(1) permits a party to move to dismiss a case for lack of
subject matter jurisdiction. This includes a challenge to standing. Rose v.
Raffensperger, 2021 WL 39578, at *3 (N.D. Ga. Jan. 5, 2021). "Because standing
is jurisdictional, a dismissal for lack of standing has the same effect as a dismissal
for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1)." Id. (citation
and quotations omitted).

Article III of the Constitution limits federal courts to the consideration of
cases and controversies. U.S. Const. art. III, § 2. The standing doctrine "is an
essential and unchanging part of the case-or-controversy requirement of Article
III." Lujan v. Defs. of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d
351 (1992). The Supreme Court has held that standing contains three different
elements: (1) an actual or imminent injury-in-fact; (2) a causal connection between

the injury and the conduct complained of; and (3) a likelihood that the injury will be redressed by the court. Id. at 560–61, 112 S. Ct. 2130.

>    B.    Motion to Dismiss Under Federal Rule 12(b)(6)

Federal Rule 8 requires that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." While this standard does not require "detailed factual allegations," neither will mere "labels and conclusions" suffice. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). Instead, the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). A claim to relief is "plausible on its face" when the facts support a "reasonable inference that the defendant is liable for the misconduct alleged." Id.; Gates v. Khokhar, 884 F.3d 1290, 1296 (11th Cir. 2018).

When a party challenges a complaint under Rule 12(b)(6) for failure to state a claim upon which relief can be granted, the Court must "accept the facts alleged in the complaint as true, drawing all reasonable inferences in the plaintiff's favor." Gates, 884 F.3d at 1296. However, the Court ignores legal conclusions or factual contentions masquerading as legal conclusions. Iqbal, 556 U.S. at 678. If the complainant has stated facts that plausibly support relief, the claim survives the motion and proceeds. If not, it ends.

6

**II.    The Homer Defendants' Rule 12(b)(1) Motion to Dismiss**

The Homer Defendants argue that none of the Plaintiffs have standing to bring claims against them and move for dismissal under Rule 12(b)(1). (Defs. Town of Homer et al.'s Mot. to Dismiss, Dkt. [22], at 2, 17–19.) Their argument is twofold: first, Plaintiffs have sued the wrong defendants, since they must sue the entities that passed and will enforce the legislation (not the Homer Defendants), and second, the business Plaintiffs do not have associational standing to sue. (Id.)

A.    Plaintiffs Have Sued the Proper Defendants

The Homer Defendants first argue that, in a voting rights case, Plaintiffs must sue the bodies that passed and will enforce the legislation. (Id. at 17–18.) Here, then, because the Homer Defendants merely lobbied the Georgia General Assembly to pass the Act but not did pass it and will not enforce it themselves, they contend that they are not the proper defendants. (Id.) Instead, the Homer Defendants assert that Plaintiffs should have sued Georgia's General Assembly. (Id.)

This argument is meritless. This Court has previously concluded "that the Georgia House of Representatives, the Georgia State Senate, and both bodies' various local delegations do not have capacity to sue and be sued" and that these entities "cannot be sued." DeJulio v. Ga., 127 F. Supp. 2d 1274, 1293 (N.D. Ga.

7

2001) (aff'd in part, rev'd in part on other grounds, <u>DeJulio v. Ga.</u>, 290 F.3d 1291

(11th Cir. 2002)). Rather, a plaintiff's "recourse" is to sue "individual members of

those bodies in their official capacities." <u>Id.</u> as 1294. Moreover, in numerous

Georgia cases like this one involving disputed "local legislation,"[2] plaintiffs have

permissibly sued the relevant boards of elections and registrations and individuals

representing those entities, and *not* the General Assembly. <u>See, e.g.</u>, <u>Adamson v.

Clayton Cnty. Elections and Registration Bd.</u>, 876 F. Supp. 2d 1347 (N.D. Ga.

2012); <u>Smith</u>, 314 F. Supp. 2d at 1281.

Here, Plaintiffs have sued the town of Homer itself, the town council,

council members in their individual and official capacities, the town clerk, the

Banks County Board of Elections, and the Banks County election supervisor and

registrar. Plaintiffs need not have—and, indeed, could not have—sued the General

Assembly itself. The Court therefore rejects the Homer Defendants' invitation to

dismiss the case entirely for lack of standing.

---

[2] "Local legislation" is legislation that is presented in the Georgia General Assembly and which only applies to a specific city, county, or special district. <u>Smith v. Cobb Cnty. Bd. of Elections and Registrations</u>, 314 F. Supp. 2d 1274, 1281 n.6 (N.D. Ga. 2002) (citation omitted). "It comprises a large part of the bills introduced and enacted by the Legislature each year." <u>Id.</u> (citation omitted).

B.      The Business Plaintiffs Do Not Have Standing

The Homer Defendants also argue that the business Plaintiffs—Banks County Golf, LLC and Green Ridge Builders of Georgia, LLC—do not have standing to bring claims based on the alleged violation of District 3 voters' voting rights, since the business Plaintiffs' members do not have standing in their own right and the business Plaintiffs' purpose has nothing to do with voting rights. (Defs. Town of Homer et al.'s Mot. to Dismiss, Dkt. [22], at 18–19.) Plaintiffs, of course, disagree, explaining that "the voting rights associated with residency in [the business Plaintiffs'] subdivision is germane to their purpose."[3] (Pls.' Resp. to Homer Defs.' Mot. to Dismiss, Dkt. [29], at 9.)

"Organizations, like individuals, can establish standing to sue." Fair Fight Action, Inc. v. Raffensperger, 413 F. Supp. 3d 1251, 1266 (N.D. Ga. 2019) (citation omitted). They can establish associational standing by proving that their members "would otherwise have standing to sue in their own right." Ga. Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cnty. Bd. of Registrations and Elections, 499 F. Supp. 3d 1231, 1240 (N.D. Ga. 2020) (citation and quotations omitted).

---

[3] Plaintiffs also argue that "the Builder Plaintiffs are voters in the proposed District 3." (Pls.' Resp. to Homer Defs.' Mot. to Dismiss, Dkt. [29], at 9.) But, by their own admission, the Builder Plaintiffs are limited liability companies, not individuals, and therefore do not vote. Further, Plaintiffs do not identify the members of either limited liability company, so the Court cannot assess whether their members are District 3 voters.

"The interests at stake must be germane to the organization's purpose, and the suit itself also must be one that does not require individual member participation." Id. (citation and quotations omitted).

Plaintiffs' complaint makes clear that the business Plaintiffs are Georgia limited liability companies whose purposes are to conduct business and sell homes to prospective residents in Homer, specifically in the geographical area that now constitutes District 3. (Compl., Dkt. [1], at ¶¶ 6–7, 9.) They do not allege that the business Plaintiffs focus on civic advocacy or civil rights work in any capacity. The development and sale of residential real estate does not sufficiently relate to the interests at stake in this suit—the voting rights of District 3 resident voters. Therefore, because the interests at stake here are not clearly germane to the business Plaintiffs' purposes, they do not have standing to sue, and the business Plaintiffs' claims are dismissed.

## III. The Homer Defendants' and Banks County Defendants' Rule 12(b)(6) Motions to Dismiss

Plaintiffs' complaint appears to allege several distinct, but related, voting rights claims: violation of the one-person, one-vote rule under the Fourteenth Amendment; vote dilution under Section 2 of the Voting Rights Act; and vote dilution under the Equal Protection Clause of the Fourteenth Amendment. (Compl., Dkt. [1], at ¶¶ 94–96, 109–23.) Both the Homer Defendants and the Banks County

10

Defendants argue[4] that the Plaintiffs' claims should be dismissed under Rule

12(b)(6) for a myriad of reasons: the Act does not violate the one-person, one-vote

rule; Plaintiffs' complaint does not assert a claim for racial vote dilution under

Section 2 of the Voting Rights Act or the Equal Protection Clause of the

Fourteenth Amendment; and Plaintiffs' claims against all Homer Defendants other

than the town of Homer itself are duplicative. (Homer Defs.' Mot. to Dismiss, Dkt.

[22], at 2–16, 19–24; Br. in Supp. of Banks Cnty. Defs.' Mot. to Dismiss, Dkt. [25-

1], at 2–15.) The Court will address each of Plaintiffs' claims, and Defendants'

arguments for dismissal of those claims, in turn below.

A.   Claim for Violation of One-Person, One-Vote Rule Under Fourteenth
Amendment

Defendants move for dismissal of Plaintiffs' purported one-person, one-vote

claim, arguing that the Act does not violate the rule since it creates residency

districts that are voted on by the entire town in at-large municipal elections, the

council posts are evenly distributed by population across the districts, and the

districts were created for legitimate purposes. (Homer Defs.' Mot. to Dismiss, Dkt.

---

[4] Although each set of Defendants filed separate motions to dismiss, their arguments
frequently overlap. Accordingly, the Court will generally discuss their arguments
interchangeably, only distinguishing between them when necessary.

[22], at 2, 4–13; Br. in Supp. of Banks Cnty. Defs.' Mot. to Dismiss, Dkt. [25-1], at 2, 9–14.)

The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST., amend. XIV, § 1. The Clause requires "that electoral districts be of nearly equal population, so that each person's vote may be given equal weight in the election of representatives." Voinovich v. Quilter, 507 U.S. 146, 160–61, 113 S.Ct. 1149, 1159, 122 L.Ed.2d 500 (1993) (citation and quotations omitted).

The Supreme Court has referred to this principle as "one-person, one-vote," and it applies to "any election in which persons are selected by popular vote to perform governmental functions." Smith, 314 F. Supp. 2d at 1284 (citing Hadley v. Junior Coll. Dist., 397 U.S. 50, 56, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970)). The principle requires that, "when members of an elected body are chosen from separate districts, each district must be established on a basis that will insure, as far as is practicable, that equal numbers of voters can vote for proportionally equal numbers of officials." Hadley, 397 U.S. at 56, 90 S.Ct. 791.

Accordingly, "[i]t is a deprivation of voters' constitutional rights to elect commissioners [or other officials] from districts of substantially unequal

population in that the 'votes of some residents have greater weight than those of others.'" Crumly v. Cobb Cnty. Bd. of Elections and Voter Registration, 892 F. Supp. 2d 1333, 1342 (N.D. Ga. 2012) (quoting Avery v. Midland Cnty., 390 U.S. 474, 480–81, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968)). However, "[a] strict standard requiring absolute mathematical equality among state legislative districts is not … constitutionally required." Kidd v. Cox, 2006 WL 1341302, at *6 (N.D. Ga. May 16, 2006) (citation omitted). And "[s]tates may deviate somewhat from perfect population equality to accommodate traditional districting objectives," such as "preserving the integrity of political subdivisions, maintaining communities of interest, and creating geographic compactness." Evenwel v. Abbott, 577 U.S. 937, 136 S.Ct. 1120, 1121, 1124, 194 L.Ed.2d 291 (2016) (citation omitted); see also Ga. State Conference of NAACP v. Fayette Cnty. Bd. of Comm'rs, 996 F. Supp. 2d 1353, 1362–65 (N.D. Ga. 2014) (noting that additional districting objectives can include minimizing splits of political subdivisions and protecting incumbents) (citations omitted).

Given these dual (and at times conflicting) aims, courts have established permissible benchmarks for population deviation, such that "state or local districting plans with a population deviation less than 10 percent belong to the category of minor deviations that are consistent with the constitutional

requirements." Ga. State Conference of NAACP, 996 F. Supp. 2d at 1367 (citing

Voinovich, 507 U.S. at 161, 113 S.Ct. 1149); see also Evenwel, 577 U.S. 937, 136

S.Ct. 1120, 1121, 1124 ("Where the maximum population deviation between the

largest and smallest district is less than 10%, a state or local legislative map

presumptively complies with the one-person, one-vote rule. Maximum deviations

above 10% are presumptively impermissible.") (citations omitted).

Though it does appear that Districts 1 and 2 have substantially bigger

populations than does District 3,[5] Plaintiffs do not primarily focus on this apparent

disparity.[6] Instead, they highlight the new candidate residency requirement,

contending that it "unfairly limits District 3 Voters' ability to fairly participate in

the electoral process."[7] (Pls.' Resp. to the Cnty. Defs.' Mot. to Dismiss, Dkt. [28],

at 10.)

---

[5] Both Plaintiffs and Defendants submitted the proposed district map as an exhibit to their
respective filings. This map is based on 2010 census data, rather than the forthcoming
2020 census data, but it shows that District 1 has an estimated population of 453 people,
District 2 has an estimated population of 457 people, and District 3 has an estimated
population of 231 people. (Banks County Defs.' Mot. to Dismiss, Ex. A, Dkt. [25-2].)
[6] The Court makes no further comment on the apparent population disparity between the
districts here (or the objectives put forth by Defendants in support of the districting),
because this issue is not dispositive of Plaintiffs' one-person, one-vote claim.
[7] Plaintiffs also contest the fact that District 3 has only one residential council position,
making it a single-member district, while Districts 1 and 2 each have two positions,
rendering them multi-member districts. However, as Defendants point out, the Supreme
Court and this Court have consistently held that "multimember districts are not per se
unconstitutional, nor are they necessarily unconstitutional when used in combination with

That argument is unavailing, thanks to a long-established body of case law holding that election policies requiring that candidates be residents of certain districts that do not contain equal numbers of people do not violate the one-person, one-vote principle if all officials are elected at large. See, e.g., Hadley, 397 U.S. at 58, 90 S.Ct. 791 ("We have previously upheld against constitutional challenge an election scheme that required that candidates be residents of certain districts that did not contain equal numbers of people. Since all the officials in that case were elected at large, the right of each voter was given equal treatment.") (citation omitted); Dusch v. Davis, 387 U.S. 112, 87 S.Ct. 1554, 18 L.Ed.2d 656 (1967) (permitting city to elect its legislative body by a process that included at-large voting for candidates, some of whom were required to reside in certain districts, even though the residence districts varied widely in population).

This case is no different. Here, the Act divides Homer into three districts, which are to be represented by five council members. Each council member must reside in the district he or she represents, but he or she is elected by the entire town in an at-large election, rather than only by the individuals in his or her district.

---

single-member districts in other parts of the State." White v. Regester, 412 U.S. 755, 765, 93 S.Ct. 2332, 2339, 37 L.Ed.2d 314 (1973) (citations omitted); see also Larios v. Perdue, 306 F. Supp. 2d 1190, 1208 (N.D. Ga. 2003) ("[T]o the extent the complaint alleges that the mere co-existence of single- and multi-member districts in the 2001 House plan is unconstitutional, plaintiffs' claim is dismissed pursuant to Fed. R. Civ. P. 12(b)(6).").

Such a plan is lawful and does not violate the one-person, one-vote rule under the

Fourteenth Amendment.[8]

In an effort to save their argument, Plaintiffs contend that the Act is

unconstitutional because it uses ten-year-old population data from the last

decennial census, even though data from the 2020 census has been collected and

will be released in the next few months. (Pls.' Resp. to Homer Defs.' Mot. to

Dismiss, Dkt. [29], at 1–2, 4, 10, 15.) Plaintiffs do not cite case law in support of

this argument, nor does their argument find legal support. The Georgia

Constitution "imposes no temporal limitation" on the General Assembly's

reapportioning of districts after the last decennial census, and Georgia courts have

held that "[t]he frequency of reapportionment between censuses is solely a matter

of unfettered legislative discretion." Blum v. Schrader, 637 S.E.2d 396, 398–99

(Ga. 2006). Moreover, the Supreme Court and other federal courts have generally

afforded discretion to state legislatures when their redistricting or reapportionment

---

[8] That said, the Court cautions Defendants that the Act is not entirely insulated from constitutional attack. The Supreme Court has noted that, as such a plan becomes effective, "if it then operates to minimize or cancel out the voting strength of racial or political elements of the voting population, it will be time enough to consider whether the system still passes constitutional muster." Dallas Cnty., Ala. v. Reese, 421 U.S. 477, 480, 95 S.Ct. 1706, 1708, 44 L.Ed.2d 312 (1975) (citation and quotations omitted). In other words, a constitutional challenge to this type of election system must be based on factual findings once the system is implemented, not premature and unsubstantiated speculation.

relied on the last decennial census, even if the redistricting occurred years after the release of that data. See, e.g., League of United Latin Am. Citizens v. Perry, 548 U.S. 399, 404, 126 S.Ct. 2594, 2601, 165 L.Ed.2d 609 (2006) ("Neither the Constitution nor Congress has stated any explicit prohibition of mid-decade redistricting to change districts drawn earlier in conformance with a decennial census."); Pol. Action Conference of Ill. v. Daley, 976 F.2d 335, 340 (7th Cir. 1992) ("[T]he critical question is whether the 1991 election, which was based on a ward map approved in 1985 using 1980 census data, was valid under Reynolds[.] Reynolds' explicit language … demonstrates that Chicago's 1991 election represents no constitutional violation" and "were not the result of an unreasonably delayed reapportionment procedure.") (citation omitted). To be clear, this Court does not mean to explicitly endorse legislative redistricting at the end of a decennial period. But the Act at issue here was passed before the 2020 census was completed and therefore relied on what was—and is—still current population data. Under these facts, the Court cannot find the Act constitutional.

Accordingly, Plaintiffs have failed to state a claim that the Act violates the one-person, one-vote rule under the Fourteenth Amendment, and this claim is dismissed.

B.      Vote Dilution Claim Under Section 2 of the Voting Rights Act

Defendants similarly argue that Plaintiffs have failed to state a claim for vote dilution under Section 2 of the Voting Rights Act. (Homer Defs.' Mot. to Dismiss, Dkt. [22], at 13–16; Br. in Supp. of Banks Cnty. Defs.' Mot. to Dismiss, Dkt. [25-1], at 4, 8–9.) In response, Plaintiffs contend that they have sufficiently stated such a claim, but also that they have not limited their Voting Rights Act claims to Section 2, since "[m]ultiple provisions of the Voting Rights Act potentially apply" here. (Pls.' Resp. to the Cnty. Defs.' Mot. to Dismiss, Dkt. [28], at 10–12.) However, Plaintiffs do not specifically explain *which* other provisions allegedly apply or how the Act violates these additional provisions. The Court cannot evaluate the merits of an argument that has not been made. Even if it could, it is not apparent to the Court how other provisions of the Voting Rights Act could apply here. Accordingly, the Court evaluates Plaintiffs' allegations solely under Section 2.

Section 2 of the Voting Rights Act prohibits standards, practices, and procedures that deny or abridge the right to vote of any United States citizen based on race or color. 52 U.S.C. § 10301(a). Such a violation can be established:

> if, based on the totality of circumstances, it is shown that
> the political processes leading to nomination or election
> in the State or political subdivision are not equally open
> to participation by members of a class of citizens

18

> protected by subsection (a) in that its members have less
> opportunity than other members of the electorate to
> participate in the political process and to elect
> representatives of their choice.

Id. at § 10301(b). "The statute does not, however, create an entitlement to

proportional representation for members of a protected class." Rose, 2021 WL

39578, at *4 (citation omitted).

In Thornburg v. Gingles, the Supreme Court interpreted Section 2 to require

that the focus "be on the *results* of the challenged standards, practices, and

procedures—not on whether those processes had been adopted because of

discriminatory intent." Id. (citing Gingles, 478 U.S. 30, 35–36, 106 S.Ct. 2752, 92

L.Ed.2d 25 (1986)) (emphasis in original). To make out a vote dilution claim after

Gingles, plaintiffs must show that they have satisfied three prerequisites:

> First, the minority group must be able to demonstrate that
> it is sufficiently large and geographically compact to
> constitute a majority in a single-member district. If it is
> not, as would be the case in a substantially integrated
> district, the multi-member form of the district cannot be
> responsible for minority voters' inability to elect its
> candidates. Second, the minority group must be able to
> show that it is politically cohesive. If the minority group
> is not politically cohesive, it cannot be said that the
> selection of a multimember electoral structure thwarts
> distinctive minority group interests. Third, the minority
> must be able to demonstrate that the white majority votes
> sufficiently as a bloc to enable it—in the absence of
> special circumstances, such as the minority candidate

> running unopposed—usually to defeat the minority's
> preferred candidate.

Gingles, 478 U.S. at 50–51, 106 S.Ct. 2752 (citations and punctuation omitted). In

addition, the Court held that at-large elections are not *per se* violative of Section 2,

but they can be if, under the totality of the circumstances, they "result in unequal

access to the electoral process." Id. at 46, 106 S.Ct. 2752 (citation omitted).

"In addition to applying the Gingles factors, courts generally must also

consider several factors—identified in the Senate Report accompanying the 1982

VRA amendment—that can be relevant to Section 2 claims." Rose, 2021 WL

39578, at *5 (citation omitted). The Eleventh Circuit has explained that the factors

that will "typically establish" a violation of Section 2 are:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

20

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Id. (quoting Solomon v. Liberty Cnty., Fla., 899 F.2d 1012, 1015–16 (11th Cir. 1990) (citation omitted)). Two additional factors may be considered probative of a Section 2 violation:

[W]hether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; [and]

[W]hether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

Id. (quoting Solomon, 899 F.2d at 1016). "[T]hese nine factors will often be pertinent to certain types of [Section] 2 violations, particularly to vote dilution claims." Id. at *6 (citation and quotations omitted).

Plaintiffs have not sufficiently alleged the <u>Gingles</u> preconditions here. First, they do not allege that any minority group "is sufficiently large and geographically compact to constitute a majority in a single-member district." <u>Gingles</u>, 478 U.S. at 50, 106 S.Ct. 2752. Instead, they solely allege that two of the Plaintiffs are African-American and all of the individual Defendants are white, "District 3 … is a large and geographically compact group of voters" that "has more numerosity and diversity of race, national origin, and language, and "Districts 1 and 2 have proportionally more Caucasian or white voters than District 3." (Compl., Dkt. [1], at ¶¶ 10, 33–36.) In addition, in one of their opposition briefs, they assert that more racial minorities have moved into District 3 in the last decade and "the Act isolates almost all non-white voters in Homer into a single district." (Pls.' Resp. to the Cnty. Defs.' Mot. to Dismiss, Dkt. [28], at 10.) In sum, then, Plaintiffs appear to rest their argument on the assertion that District 3 is more racially diverse (and perhaps continues to get more diverse) than the primarily-white Districts 1 and 2. Even if these allegations could be proven true through discovery, they would still be insufficient to show that a minority group was sufficiently large and geographically compact to make up a majority of District 3.

Moreover, Plaintiffs fail to even allege facts to support the second and third <u>Gingles</u> factors—that the minority group in District 3 is politically cohesive, and

that the white majority in Districts 1 and 2 vote as a bloc sufficiently to defeat the

minority group's preferred candidates. In addition, Plaintiffs do not allege that any

of the nine factors "typically establish[ing]" a Section 2 violation are applicable or

relevant here. Having failed to allege any of the <u>Gingles</u> elements or any of the

factors probative of a Section 2 violation, Plaintiffs' vote dilution claim under

Section 2 of the Voting Rights Act fails and must be dismissed.

    C.    <u>Vote Dilution Claim Under the Equal Protection Clause of the
Fourteenth Amendment</u>

Plaintiffs also appear to allege a claim for vote dilution under the Equal

Protection Clause of the Fourteenth Amendment.[9] Defendants argue that this claim

should be dismissed for the same reasons as Plaintiffs' claim for vote dilution

under Section 2 of the Voting Rights Act. (Defs. Town of Homer et al.'s Mot. to

Dismiss, Dkt. [22], at 13–16; Br. in Supp. of Banks Cnty. Defs.' Mot. to Dismiss,

Dkt. [25-1], at 2, 8, 9–14.)

"Like § 2 of the Voting Rights Act, the Fourteenth Amendment's Equal

Protection Clause creates a cause of action for racially discriminatory vote

dilution." <u>Lowery v. Deal</u>, 850 F. Supp. 2d 1326, 1331 (N.D. Ga. 2012) (citing

---

[9] Admittedly, it is not entirely clear to the Court whether Plaintiffs intended to make this claim in addition to their claims alleging violations of the one-person, one-vote rule and Section 2 of the Voting Rights Act. Nevertheless, Plaintiffs' complaint at least implies such a claim, and the Court will therefore address it.

Shaw v. Reno, 509 U.S. 630, 640–41, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993)).

Unlike Section 2, though, "the Equal Protection Clause requires a showing of

discriminatory intent." Id. (citing Osburn v. Cox, 369 F.3d 1283, 1288 (11th Cir.

2004)). Accordingly, the primary difference between vote dilution claims under

Section 2 of the Voting Rights Act and the Equal Protection Clause "is that the

Equal Protection Clause requires a showing of discriminatory intent, while § 2

does not." Id. That said, this Court has held that the requirements to establish vote

dilution, separate from the discriminatory intent component, "are the same under

both provisions." Id. (citation omitted). Accordingly, it is "doubt[ful] that any

plaintiff … can establish a constitutional vote dilution claim where his [S]ection 2

claim has failed." Johnson v. DeSoto Cnty. Bd. of Comm'rs, 204 F.3d 1335, 1344

(11th Cir. 2000).

Given the Court's prior analysis and determination that Plaintiffs have failed

to state a claim for vote dilution under Section 2 of the Voting Rights Act,

Plaintiffs' vote dilution claim under the Equal Protection Clause also fails. That

said, even if Plaintiffs' had sufficiently stated a Section 2 vote dilution claim, the

Court finds that they have not pled the "discriminatory intent" component

necessary to establish a vote dilution claim under the Equal Protection Clause. The

closest Plaintiffs come to pleading discriminatory intent are their allegations that:

Homer facilitated the passing of this Act ten years after the 2010 census and just before the release of new census data, District 3 is more racially diverse than Districts 1 and 2, and Homer's mayor and council members said that the Act was necessary to keep District 3 from taking over the town. (Compl., Dkt. [1], at ¶¶ 34–35, 54–55, 64.) But these allegations are largely speculation on Plaintiffs' part and are plainly insufficient to allege Defendants' discriminatory intent.

Accordingly, Plaintiffs' vote dilution claim under the Equal Protection Clause of the Fourteenth Amendment also fails and must be dismissed.

D.  Plaintiffs' Subordinate Claims for Declaratory Judgment, Injunctive Relief, Section 1983 Damages, and Section 1988 Attorney's Fees

Because Plaintiffs have failed to state a claim for relief on any of their substantive claims, they have also failed to state a plausible claim that they are entitled to attorney's fees, damages, or declaratory or injunctive relief on any of their claims. See Williams v. Ocwen Loan Servicing, LLC, 2016 WL 5339359, at *19–20 (N.D. Ga. May 9, 2016) (citations omitted). Accordingly, Plaintiffs' subordinate claims for declaratory judgment, injunctive relief, Section 1983 damages, and Section 1988 attorney's fees are all dismissed.

## Conclusion

For the foregoing reasons, Defendants Town of Homer, Georgia et al.'s Motion to Dismiss [22] is **GRANTED**, Defendants Banks County Board of Elections et al.'s Motion to Dismiss [25] is **GRANTED**, and Plaintiffs Earl Tyson et al.'s Motion for Oral Argument on Defendants' Motions to Dismiss [32] is **DENIED**. The Clerk is **DIRECTED** to enter **FINAL JUDGMENT** in favor of Defendants and to **CLOSE** the case.

**SO ORDERED** this 2nd day of July, 2021.

_____

**RICHARD W. STORY**
United States District Judge